Anne WAECHTER, Appellant,

v.

ALUMINUM COMPANY OF
AMERICA, Appellee.

No. 89–562.

Supreme Court of Iowa.

April 18, 1990.

Michael J. McCarthy of McCarthy &
Lammers, Davenport, for appellant.

Kevin L. McKnight and Edward D.
Marks, Pittsburgh, Pa., and William C.
Davidson and Carole J. Anderson of Lane
& Waterman, Davenport, for appellee.

Considered by McGIVERIN, C.J., and
LARSON, CARTER, LAVORATO and
NEUMAN, JJ.

LAVORATO, Justice.

The decisive issue here is whether an
employee and an employer reached an
agreement that settled the employee's
claim against the employer for allegedly
violating Iowa's employee drug testing law.
The district court thought so. We do too,
and affirm.

Anne Waechter is an employee at the
ALCOA plant in Bettendorf. She has
worked there since 1980.

On December 3 Waechter was working
the 11 p.m. to 7 a.m. shift. That evening
she was assigned to drive a Sky Giant fork
lift in the hot mill department. These fork
lifts are used to haul hot and cold ingots of
metal. A fully loaded fork lift weighs ap-
proximately 134,000 pounds.

At about 11:30 that evening an employee
told Jack Davidson, Waechter's supervisor,
that Waechter was driving a "tagged out"
vehicle. A "tag out" is a safety procedure
ALCOA uses to denote a faulty or danger-
ous piece of equipment. Once such a piece
of equipment is discovered, a tag describ-
ing the problem is placed on it.

ALCOA has a safety rule against em-
ployees using tagged out equipment.

Usually supervisors place these tags on the equipment. The tags can only be removed by employees of the repair department.

Davidson stopped Waechter and asked if the Sky Giant she was driving had been tagged out. Waechter said that it had and admitted she had removed the tag. The Sky Giant had been tagged out because of a leak in the hydraulic brake system. Davidson ordered Waechter to replace the tag and get another Sky Giant.

After Waechter switched vehicles, Davidson noticed that she was not wearing a hard hat. Another ALCOA safety rule requires all plant employees to wear hard hats. When Davidson questioned Waechter about this, she told him that she had left her hard hat in the tagged out Sky Giant. Davidson then ordered her to get the hat immediately.

Davidson next saw Waechter in the break room and noticed that she still was not wearing her hard hat. About this time another employee complained to Davidson about Waechter's driving. The employee claimed that Waechter had been driving the loaded Sky Giant too fast and that she had gone through stoplights.

Davidson called Waechter out of the break room and asked her about her hard hat. When Waechter told Davidson that the hat was still on the tagged out Sky Giant, he drove her to the vehicle to get it. As the two were riding in Davidson's truck, he smelled alcohol on Waechter's breath. When Davidson questioned her about it, Waechter admitted that she had been celebrating her birthday before work.

Waechter told Davidson that she had her last drink at 8 p.m. Waechter insisted she was fine and to prove her point volunteered to take an alcohol test.

Davidson then ordered Waechter not to drive the Sky Giant. Nevertheless, Waechter disobeyed the order and drove the vehicle back to the break room. Because of this last act of defiance, Davidson went to his supervisor, Randy Webber. Webber instructed Davidson to take Waechter to the nurse's station for an alcohol test. Webber suggested the test primarily because Waechter volunteered to take it.

When Davidson and Waechter got to the nurse's station, Waechter immediately asked for the presence of a union steward. After the steward arrived, Patty Cahill, a registered nurse, began administering the tests. First, Cahill had Waechter perform some field sobriety tests. Waechter barely passed them.

Cahill then administered a breathalyzer test, which registered .145. In Iowa .1 indicates intoxication for purposes of our drunk driving statute. *See* Iowa Code § 321J.2(1)(a).

Cahill next performed a urinalysis, which showed a high level of alcohol in Waechter's system. As a result of these tests, Cahill decided that Waechter was too intoxicated to continue working or to drive home. So Cahill had one of ALCOA's guards drive Waechter home.

Before Waechter left work, she was told to call the plant the next morning. Waechter did so and spoke with Dave Sellers, the secretary-clerk for the hot mill department. Sellers told Waechter that she was suspended for three days pending further action.

John Vasquez, the Industrial Relations and Training Superintendent for ALCOA, conducted an immediate investigation about the circumstances leading to Waechter's three-day suspension. The hot mill department gave Vasquez a full report which included the tag out violation, the hard hat violation, the insubordination for failing to follow orders, and the intoxication. Vasquez concluded the three-day suspension was proper.

After this investigation, Vasquez met with Richard Kluger, the first vice president of Waechter's union, and Waechter. Vasquez reported to them about his investigation and listened to Waechter's version of what happened.

After this meeting, Vasquez met with Bob Hauptman, the superintendent of the hot mill department, to discuss the appropriate disciplinary sanctions. The two reviewed all the events leading up to Waechter's suspension. Both agreed that se-

vere disciplinary action was needed. Hauptman recommended dismissal, but Vasquez was in favor of a significant suspension. After Vasquez met with Hauptman, ALCOA decided to discharge Waechter. At the end of her three-day suspension, Waechter again spoke with Sellers, who then informed her of her dismissal.

When Waechter learned of her discharge, she met with union officials and a union lawyer. The union lawyer told Waechter that she might have a claim against ALCOA under Iowa Code section 730.5, Iowa's employee drug testing law.

According to section 730.5 an employer cannot require an employee to submit to "a drug test as a condition of employment, preemployment, promotion, or change in status of employment." Iowa Code § 730.5(2) (Supp.1987). In addition, Iowa's law prohibits "random or blanket drug testing of employees." *Id.* The law does permit the drug testing of a specific employee, but only if several conditions are met. *See id.* at § 730.5(3)(a)–(f). The employer can require a drug test if "the employer has probable cause to believe that the employee's faculties are impaired on the job." *Id.* at § 730.5(3)(a). The employer, however, cannot discipline the employee the first time such a test indicates the presence of alcohol or a controlled substance if the employee undergoes substance abuse evaluation and treatment if necessary. *Id.* at § 730.5(3)(f).

The law provides several remedies for employees when their rights are violated. The employee may bring a civil action against the employer seeking, among other things, reinstatement, back pay, attorney fees, and court costs. *Id.* at § 730.5(9)(a). In addition, the aggrieved employee may apply for injunctive relief prohibiting the employer from continuing its illegal drug testing. *Id.* at § 730.5(9)(b).

Relying on the union lawyer's advice, Waechter filed a grievance under the union's collective bargaining agreement with ALCOA. Waechter's grievance was in two parts. She asserted the discipline she was given was inappropriate under the collective bargaining agreement. And she asserted that ALCOA's policy and procedure for drug testing violated Iowa law. She sought reinstatement and to "be made whole in every way."

When Vasquez received the grievance notice, he set up a meeting between ALCOA and the union. Vasquez met with the union president, Mark Flaherty, and the union's vice president, Larry Meek. Vasquez told the two that ALCOA was interested in reinstating Waechter and working out a settlement. The two union officials, however, told Vasquez the union believed that ALCOA's drug testing policy was illegal. So both men would not commit the union to an agreement on that issue.

Vasquez met a second time with Flaherty and Meek. Waechter was present at this second meeting. Settlement of Waechter's grievance was again discussed. Vasquez offered Waechter a sixty-day suspension with thirty days to be served administratively (on paper only) and thirty days to be actually served. In addition, Waechter had to agree to undergo alcohol evaluation and counseling, if necessary. (Just prior to this meeting Waechter, at ALCOA's direction, did undergo substance abuse evaluation but the results were not available at the meeting.) In return, ALCOA offered to reinstate Waechter at her present position and to pay for the evaluation.

The two union officials told Waechter that it was up to her whether she would agree to ALCOA's terms. The two officials also made it very clear that the union would not be a party to such an agreement. They feared such action could be interpreted as a concession by the union that ALCOA's drug testing procedure was legal. The union's position was that the law specifically prohibited the disciplining of an employee for a first time offense. So, according to the union, all employees should have one "freebie."

At the end of the meeting Waechter agreed to accept ALCOA's offer. Vasquez understood that the agreement reached was a full and complete settlement of all the issues contained in Waechter's grievance. One of those issues included Waechter's assertion that ALCOA's drug test-

ing procedure violated Iowa law. As to this last issue Waechter did not insist on reserving any possible claim she might have had against ALCOA under Iowa Code section 730.5.

A few weeks after the meeting, Vasquez sent a letter to Waechter and the union confirming the settlement. The letter specifically states that "The parties agree that this is full and final settlement of Hotline Grievance # 569 and all other issues and/or claims regarding this discipline." Neither Waechter nor the union signed a written settlement agreement. In addition, neither specifically objected to any of the terms contained in Vasquez's letter.

Waechter served her thirty-day suspension and returned to work on January 4, 1988. By this time ALCOA had received the results of Waechter's substance abuse evaluation. The agency that had evaluated Waechter determined that no treatment was necessary. After Waechter returned to work, she told the union to withdraw her grievance.

The following month Waechter brought this suit in equity against ALCOA. She alleged that ALCOA had violated Iowa Code section 730.5 when it required her to take a drug test and disciplined her for being intoxicated on the job. The relief she requested included back pay from the date of her suspension to the date she was reinstated, restoration of her seniority, court costs, and attorney fees. *See* Iowa Code § 730.5(9)(a).

█ Following a bench trial, the district court found that Waechter had reached a full and final settlement of all her grievance issues and dismissed her petition. In reaching this decision the district court noted that the relief Waechter sought was the same relief she requested in her withdrawn grievance.

The district court also found that Waechter understood that the agreement settled any claim she might have had against ALCOA under Iowa Code section 730.5. And the court noted that Waechter never told ALCOA that she did not intend to settle this claim. Finally, the court found

that Waechter not only accepted ALCOA's offer but also received all the benefits of it.

Waechter appealed. On appeal she contends, among other things, that she and ALCOA never reached a binding agreement that settled her claim under Iowa Code section 730.5. For reasons that follow, we think the parties did reach such an agreement.

Our review is de novo. Especially when considering the credibility of witnesses, we give weight to the fact findings made by the district court but we are not bound by them. Iowa R.App.P. 14(f)(7).

We recently summarized the law regarding settlement agreements in *Wright v. Scott:*

> The law favors settlement of controversies. A settlement agreement is essentially contractual in nature. The typical settlement resolves uncertain claims and defenses, and the settlement obviates the necessity of further legal proceedings between the settling parties. We have long held that voluntary settlements of legal disputes should be encouraged, with the terms of settlements not inordinately scrutinized.

410 N.W.2d 247, 249 (Iowa 1987) (citations omitted).

█ Additionally, because settlement agreements are essentially contracts, we look to the legal principles applicable to contracts when interpreting them. When we do interpret settlement agreements, our primary concern is to ascertain the intention of the parties. *Mensing v. Sturgeon,* 250 Iowa 918, 928, 97 N.W.2d 145, 151 (1959).

█ In searching for that intention, we look to what the parties did and said, rather than to some secret, undisclosed intention they may have had in mind, or which occurred to them later. *Brown v. Hughes,* 251 Iowa 444, 449, 99 N.W.2d 305, 307–08 (1960). In addition we are guided by another sound principle that has particular application to settlements: in the absence of an express reservation of rights, a settlement agreement disposes of all claims between the parties arising out of the

event to which the agreement related. *See Mensing,* 250 Iowa at 929, 97 N.W.2d at 151; *Brown,* 251 Iowa at 448, 99 N.W.2d at 307.

■ On our de novo review we are convinced that the parties intended to settle Waechter's claim against ALCOA for allegedly violating Iowa's employee drug testing law. The claim was clearly on the minds of the parties from the time the grievance was filed until Waechter accepted ALCOA's terms of settlement. Yet Waechter made no move to reserve her claim. And she made no objection to Vasquez's letter which explicitly stated that the agreement was a full and final settlement of the grievance and "all other issues and/or claims regarding this discipline." What Waechter did do was to accept the benefits of the settlement and withdraw her grievance.

The facts in this case are not unlike those in *Mensing.* In *Mensing* the parties reached a settlement of a personal injury lawsuit. The plaintiffs executed a release and filed a dismissal. The defendant reserved no claims against the plaintiffs arising out of the incident giving rise to the lawsuit. But later the defendant filed suit against the plaintiffs for damages allegedly arising out of the same incident. We said the settlement barred the second suit because the defendant in the first suit did not expressly reserve his claim for damages against the plaintiffs. What we said in *Mensing* has particular application here:

> The ordinarily reasonable and reasoning man occupying the position of the Sturgeons (the plaintiffs in the first suit) at the time they accepted a settlement of their claim and executed the release and dismissal of their suit would think the entire matter was settled. He would not expect the defendant to pay him money in satisfaction of his claim and then sue him on a cross-claim. No reason appears why the defendant should pay money to the plaintiffs when he felt they were actually indebted to him. We think Mensing (the defendant in the first suit) must be held to have had the same idea of full settlement as the plaintiffs; that

would be the reasoning of the average man. If Mensing had a mental reservation, if he in fact intended to settle with the Sturgeons for a comparatively small amount so he could then sue them for a larger sum without danger of counterattack, fair dealing required that he should have made it known.

250 Iowa at 930, 97 N.W.2d at 151.

Likewise here Vasquez thought, reasonably so, that the matter was fully settled. A reasonable person in Vasquez's position would not expect Waechter to accept the benefits of the settlement agreement and then sue ALCOA. No reason appears to us why Waechter would return to work and withdraw her grievance if she fully believed ALCOA still owed her something.

Had Waechter truly intended to sue ALCOA after the settlement agreement was reached, we think she should have made that fact known to Vasquez before the agreement was reached. The equitable principle of fair dealing that we recognized in *Mensing* required such a disclosure. In the absence of the disclosure, we hold Waechter to the same "idea of full settlement" that Vasquez had. *Mensing,* 250 Iowa at 930, 97 N.W.2d at 151. We conclude the district court correctly found that the parties settled any claim that Waechter might have had against ALCOA under Iowa Code section 730.5.

Waechter raises lack of consideration and economic duress as other issues. Waechter failed to raise these issues in the district court so we do not consider them here. *See Suckow v. NEOWA FS, Inc.,* 445 N.W.2d 776, 780 (Iowa 1989). In any event, we think neither issue has any merit.

AFFIRMED.