WESTLAKE INVESTMENTS, LLC, Plaintiff,

v.

MLP MANAGEMENT, LLC; MLP Investments, L.L.C., Pioneer Construction, Inc.; CCC/MLP Westlake, LLC; Westlake Apartments, LLC, Joe Leibold, Stan McCurdy, John Porta; MLP Multi–Family Construction, LLC; Westlake Apartments, LP; Pioneer Construction Services, Inc.; MLP Land Development LLC; CCC/Westlake Apartments, LLC; and CCC/MLP Investment, LLC, Defendants.

MLP Management, LLC; MLP Investments, LLC; Pioneer Construction, Inc.; CCC/MLP Westlake, LLC; Westlake Apartments, LLC; Joe Leibold; Stan McCurdy; John Porta; Pioneer Construction Services, Inc.; Westlake Apartments, LP, Third–Party Plaintiffs,

v.

All State Gutter, Inc.; Fieldstone Products, LLC; Jordison Construction, Inc.; R & R Building Products; Solar Industries, Inc.; C. Bennett Building Supplies, Inc.; McAninch Corporation; Production Heating Services, Inc.; Community Wholesale of Des Moines Iowa, Inc.; Senninger Plumbing Company, Inc.; TKP Contracting Company, Inc.; Jim E. Parker, Parker Associates, Third–Party Defendants.

No. 4:09–cv–00095–RAW.

United States District Court, S.D. Iowa, Central Division.

Jan. 3, 2012.

Stephen R. Eckley, David Wayne Nelmark, Belin McCormick, P.C., Des Moines, IA, for Plaintiff.

Jeffrey Dean Stone, Stephen D. Marso, Whitfield & Eddy, PLC, Richard G. Book Huber, Book, Cortese, Happe & Lanz, PLC, West Des Moines, IA, Stephen G. Olson, II, Engles, Ketcham, Olson & Keith, PC, Omaha, NE, Matthew D. Jacobson, Whitfield & Eddy PLC, Des Moines, IA, for Defendants.

RULING ON DEFENDANTS' MOTION TO COMPEL/ENFORCE THEIR SETTLEMENT AGREEMENT WITH THE PLAINTIFF AND PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENTS

ROSS A. WALTERS, United States Magistrate Judge.

The above motions [674] [679] are before the Court. That there is a settlement agreement which should be enforced is not disputed, but there is a dispute about one element, namely whether $70,000 held in the trust account of defendants' counsel is to be distributed to plaintiff as a part of the settlement. The cross-motions came on for hearing on December 19, 2011. The parties stipulated that an evidentiary hearing was not required and that the cross-motions could be decided on the motion papers and exhibits filed by the parties in connection with their motions as well as additional exhibits received at hearing. The Court has carefully considered the parties' written filings and their oral arguments and now rules as follows.

## I.

## PROCEDURAL AND FACTUAL BACKGROUND

The facts are not in dispute [1] though the conclusions to be drawn from them are.

To simplify things the Court will refer to the contestants as Westlake (the plaintiff), MLP (the defendants) and the subcontractors (the third-party defendants including the architect). The persons involved in negotiating the settlement as it relates to the disputed issue were, for Westlake its counsel Stephen Eckley and Todd Lantz, for MLP its counsel Steven Schwartz and Matthew Koehler, and the principal mediator, Roger Stone.

Westlake bought a 300–unit apartment complex in West Des Moines, Iowa while the complex was under construction. The construction was to be of "first class" quality. Westlake claimed the completed project was not constructed to this standard and that there were many defects. Westlake sued MLP under numerous theories and MLP in turn sued the subcontractors whose work it claimed was lacking if Westlake was to be believed. The case was factually and legally much more complicated than this simple description would imply as the caption above hints.[2] Extensive discovery was conducted and numerous motions filed as the case labored to an October 12, 2011 trial date.

In November and December 2010, following a mediation, MLP settled with three of the presumably less-involved subcontractors, O/S Holdings, H & H Drywall, and R & N Components, for a total

1. There is no need for an evidentiary hearing where there is no substantial factual dispute concerning the settlement agreement. *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.,* 528 F.3d 556, 561 (8th Cir.2008).

2. In connection with the resolution of the present settlement dispute the Court has restored the caption as it was at the time the settlement was announced. In view of the settlement which left only an assigned third-party claim against subcontractor Fieldstone Products, L.L.C. ("Fieldstone") for trial ("only" should not imply that the issues involved in the claim are simple), the Court had reconfigured the caption.

amount of $70,000. The settlements closed in June and July 2011. The settlement proceeds were deposited in the trust account of MLP's counsel. Whether Westlake is entitled to this money in addition to what MLP said it would pay in settlement is the current issue.

The numerous remaining parties and their insurers participated in a two-day mediation on September 6 and 7, 2011. The mediators, selected by the parties, were Mr. Stone and Mr. Charles Traw, both Iowa attorneys and experienced mediators. Under discussion at the time was a global cash settlement. The settlement money was to come from two sources: the subcontractors who would pay Westlake directly, and on behalf of MLP. All of the money offered on MLP's behalf was from their primary and excess insurers and the trust account $70,000. (Def. Reply Brief [689] at 2). Westlake insisted on a contribution from MLP's principals, Mr. McCurdy and Mr. Porta, a demand rejected by MLP. (Pl. Ex. K at 2).

At the end of the two-day mediation the parties were far apart on a cash deal, but settlement discussions continued. On September 8, 2011, Mr. Eckley discussed with Mr. Stone a settlement structure which would exclude MLP's excess insurance carrier from the settlement with Westlake taking an assignment of MLP's claims against the excess carrier. (Pl. Ex. M). This would permit a settlement with a lower cash component. On September 9 Mr. Eckley and Mr. Lantz called Mr. Schwartz with the idea. Mr. Eckley and Mr. Lantz were encouraged by Mr. Schwartz's response. They next contacted Mr. Stone with a proposal which Mr. Stone relayed to Mr. Schwartz and Mr. Koehler by email on September 12. (Pl. Exs. P, Q; Def. Ex. 9). Westlake proposed that in addition to the $1 million which had been offered at the mediation by MLP's primary insurance carrier (its policy limit)

and anticipated funds from the subcontractors, the two totaling just short of $2.5 million, MLP would pay $3 million and assign its claims against the excess carrier which, if Westlake prevailed against the excess carrier, it would reimburse MLP up to $2 million. James Sinclair and his father Maurice "Mo" Sinclair owned/controlled Westlake. Mr. Stone stressed that Mo Sinclair was intent that MLP, by which he meant its principals, Mr. McCurdy and Mr. Porta, contribute to the settlement. (Pl. Ex. K; Def. Ex. 9).

Mr. Schwartz called Mr. Eckley on September 13 and later that day emailed Mr. Stone to say his clients were willing to work out an arrangement to let Westlake pursue the excess insurance carrier, but they would not contribute money to settle the case. He explained his clients, presumably referring to Mr. McCurdy and Mr. Porta, were "married and their personal assets are protected from creditors." (Def. Ex. 10 at 2).

The refusal of Mr. Schwartz's individual clients to contribute to the settlement was disappointing to Mr. Stone. On September 14 Mr. Stone emailed Mr. Schwartz and Mr. Koehler, stating "Mo Sinclair is impatient with the MLP individuals," adding his assessment "I believe a contribution from your individual clients is important," and concluding with the observation "your individual clients will be some of the primary beneficiaries of a settlement, so we need their contribution." (Def. Ex. 10 at 1). Mr. Stone continued his efforts with the subcontractors to round up more money.

On September 16 Mr. Stone circulated an email to numerous counsel. Mr. Eckley, Mr. Schwartz and Mr. Koehler were included as "Cc" addressees. Mr. Stone reported he had obtained commitments or pledges from the subcontractors totaling $1,807,500. With an expected contribution

from MLP's primary insurance carrier of $1 million there was a package of $2,807,500. Mr. Stone said he was "awaiting contributions from the MLP individuals," and two subcontractors. (Def. Ex. 16 at 4). Mr. Stone added: "I assume that each of you receiving this email will remember the amounts you told me and the terms or conditions you placed on that discussion. If we are not clear, I would appreciate receiving an email from you stating those and I will respond promptly." (*Id.*) Mr. Stone assumed the $70,000 in the trust account previously offered by MLP remained on the table because it had not been withdrawn[3] and the MLP contribution he was attempting to obtain was a personal contribution from MLP's principals. (Def. Ex. K at 2). Mr. Stone included the trust account $70,000 in the $1,807,500 subcontractor component of the settlement package he had put together, though his email did not itemize the contributions. As noted, the $70,000 was comprised of subcontractor settlement proceeds received in June and July 2011.

On September 18 Mr. Schwartz emailed Mr. Stone repeating that his clients were not willing to contribute to the settlement. (Def. Ex. 12). Fearful settlement efforts were falling apart, the next day, September 19, Mr. Stone emailed Mr. Schwartz with what is fair to describe as a plea that his clients reconsider in view of the risk of personal exposure if they went to trial. (Def. Ex. 13). Mr. Stone said he thought another $192,500 from them would result in a settlement. (*Id.*)

Mr. Stone continued to press the matter and communications went back and forth.

On the evening of Sunday, September 25, 2011 Mr. Schwartz sent an email to Mr. Eckley and Mr. Stone. He said he had been authorized to make a formal settlement proposal the first paragraph of which was: "On behalf of my clients and their primary insurance carrier, a total payment of $1.1 million will be made to Westlake." (Def. Ex. 1). Though not spelled out in the email, it was understood $1 million of this would be paid by the primary insurance carrier. Mr. Schwartz continued: "Westlake will receive all the settlement money *now being offered* by the subcontractors with which Roger Stone has been negotiating. I am not privy to those amounts but Westlake will be entitled to receive what is *still on the table.*" (*Id.*) (emphasis added). An assignment by MLP to Westlake of MLP's claims against its excess carrier was part of the proposal. The MLP corporate defendants would agree to confess judgment in an amount not more than $15 million, partially satisfied by the amounts paid to Westlake by MLP and the subcontractors. Westlake would provide a covenant not to enforce the judgment against any assets other than the excess insurance policy. (*Id.*) Finally as relevant here, Westlake would reimburse defendants up to $100,000 from the first dollar of recovery from the excess carrier after legal fees and expenses. (*Id.*) The offer did not expressly mention the trust account $70,000.

Anxious to solidify an agreement, at mid-afternoon on September 26, 2011, Mr. Eckley circulated an email stating: "Plaintiff accepts the offers made by all parties

---

**3.** Mr. Stone states in his declaration:

In my experience as a mediator for construction cases, it is customary for a mediator to assume that a party's offer remains in the settlement package, even as successive offers are rejected, without returning to each and every party participating in the mediation for a confirmation, after some other party in-

creases its contribution so that a new offer can be made. If no time limitation or other condition is placed on the offer, I assume the previous offers remain in effect, as I meet with other parties to bring them closer together.

(Pl. Ex. K at 2).

through Roger Stone, with the exception of Fieldstone and TKP." [4] (Pl. Ex. H). Westlake believed it was accepting monetary offers totaling $2,907,500, $1.1 million from MLP's primary insurer, Mr. McCurdy and Mr. Porta, and $1,807,500 in subcontractor payments. Mr. Schwartz promptly responded that he and Mr. Koehler were on their way to Des Moines and there were "a number of details that need to be worked out to make sure that all parties are on the same page and we need to put the agreement on the record." (*Id.*)

The time pressure to work out a settlement came not only from the October 12 trial date, but also the fact the Court had scheduled a final pretrial conference to commence at 10:00 a.m. on the morning of September 27. Counsel for Westlake, MLP and the many subcontractors appeared at the final pretrial conference. Mr. Stone was not present, but at 8:10 a.m. on September 27 he sent an email to Mr. Schwartz, Mr. Koehler, Mr. Eckley and Mr. Lantz showing "the final amounts committed to the settlement in a total of $2,907,500 without Fieldstone or the excess carrier." (Pl. Ex. E). Mr. Stone attached a spreadsheet which clearly indicated MLP's primary insurer would pay $1 million, the "MLP individuals" would pay $100,000, and the "Trust Account 70,000" would be paid with the subcontractor contributions. Mr. Schwartz received Mr. Stone's email but states in his declaration that he did not have time to review Mr. Stone's spreadsheet because he was busy preparing for the final pretrial conference and the various motions he expected to be argued at the conference. (Def. Ex. 3). Mr. Koehler's declaration is silent on the subject. (Def. Ex. 5).

At the outset of the final pretrial conference Mr. Eckley informed the Court that the parties were close to a resolution but a few loose ends remained. The Court adjourned proceedings to allow their discussions to continue. About two hours later the parties reassembled and Mr. Schwartz dictated an outline of the settlement into the record. The monetary terms were a "total payment" of $1.1 million representing "full payment of all of the defendants with their primary insurance carrier and without participation by the excess carrier." Mr. Schwartz continued:

> Westlake is receiving whatever money is being paid by the subcontractors on the defendants' third-party claims, so we are receiving no money from the third-party defendants who haven't already settled. The ones that are still in the case are settling and paying their money to Westlake.

(Pl. Ex. I at 2). Mr. Eckley agreed with Mr. Schwartz's summary of this and the other settlement terms. (Def. Ex. 7). Counsel agreed that after they left the courthouse they would go to Mr. Eckley's office to "write this up and sign it before the end of the day ...." (Pl. Ex. I at 4).

Mr. Eckley, Mr. Lantz, Mr. Schwartz and Mr. Koehler adjourned to Mr. Eckley's office where they spent the afternoon of September 27 working on a Memorandum of Understanding. Mr. Eckley or Mr. Lantz had a printed copy of Mr. Stone's spreadsheet and suggested that the Memorandum of Understanding list all of the contributions by each party as stated on the spreadsheet. According to Mr. Lantz, Mr. Schwartz was reluctant to do this because his clients did not want it to

---

**4.** The third-party claims against Fieldstone did not settle. All other third-party claims (including eventually against TKP Contracting Company, Inc.) were settled or dismissed on summary judgment. As part of the settlement agreement between MLP and Westlake, MLP is to assign to Westlake its third-party claim against Fieldstone. The trial of that claim had been set for November 7, 2011 but trial was continued because the assignment was held up by the present dispute.

seem as if they might be responsible for the payments committed by other parties. (Pl. Ex. Q at 2). They ultimately agreed on the following language with respect to the subcontractor payments: "Plaintiff will receive all the settlement money now being offered by the subcontractors ... with which Roger Stone has been negotiating, which plaintiff understands to be a total of $1,807,500." (Pl. Ex. A). This, plus the $1.1 million which was to be paid on behalf of defendants and their primary insurance carrier totaled $2,907,500. In argument Mr. Schwartz indicated he did not review Mr. Stone's spreadsheet during the discussions with Mr. Eckley and Mr. Lantz on the afternoon of September 27, and did not become aware of it until much later. Though counsel discussed including Mr. Stone's list of contributions in the Memorandum of Understanding, the subject of the trust account $70,000 seems not to have come up during their discussions.

The assignment of MLP's claims against the excess insurance carrier, the MLP corporate confession of judgment and covenant not to enforce the judgment except as against the excess policy, and the $100,000 first dollar reimbursement from any recovery against the excess carrier were included in the Memorandum of Understanding as well other terms. With respect to the confession of judgment, the Memorandum stated: "All corporate defendants except MLP Management, L.L.C., will agree to a confession of judgment or consent judgment on the remaining claims and the reasonableness thereof of not more than $15.6 million, partially satisfied by the $2,907,500 paid to plaintiff by defendants and the subcontractors as part of this settlement." (Pl. Ex. A). The satisfaction amount thus implicitly included the trust account $70,000. The Memorandum of Understanding was signed on September 27 by Mr. Eckley and Mr. Schwartz for their respective clients.

Westlake's counsel undertook to draft the parties' formal settlement agreement. A draft was sent to MLP's counsel on November 2, 2011. In the course of reviewing the draft agreement MLP's counsel noted the inclusion of the trust account $70,000 and the present motions were the upshot. All other terms of the formal written settlement agreement have been agreed to. Included is a provision that Westlake will accept $1 million from the primary insurance carrier and "$100,000 from Stan McCurdy and John Porta." (Pl. Ex. C at 45; Def. Exs. 8 and 22 at 4).

## II.

## DISCUSSION

### A.

■ Both sides ask the Court to specifically enforce the settlement agreement. They agree there was a settlement agreement but dispute whether the $70,000 held in the trust account of MLP's counsel was part of the subcontractor cash component of the agreement to be paid to Westlake. Neither side seeks to void the settlement agreement if the Court's ruling is adverse.

■ "The law favors settlement of controversies." *Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011)(quoting *Waechter v. Aluminum Co. of America*, 454 N.W.2d 565, 568 (1990), in turn quoting *Wright v. Scott*, 410 N.W.2d 247, 249 (Iowa 1987)). The Court has the inherent authority to enforce a settlement agreement. *Barry v. Barry*, 172 F.3d 1011, 1013 (8th Cir.1999); *see Harper Enterprises, Inc. v. Aprilia World Service USA, Inc.*, 270 Fed. Appx. 458, 460 (8th Cir.2008).

■ A settlement agreement is contractual in nature and "[b]asic principles of contract formation govern the existence and enforcement of the alleged settlement." *Chaganti & Assoc. P.C. v. Nowot-*

*ny,* 470 F.3d 1215, 1221 (8th Cir.2006), *cert. denied,* 551 U.S. 1131, 127 S.Ct. 2977, 168 L.Ed.2d 704 (2007); *see Bath Junkie,* 528 F.3d at 561; *Wright,* 410 N.W.2d at 249. The Court's jurisdiction in this case is based on diversity of citizenship, therefore, Iowa law applies to the contract issues. *Barry,* 172 F.3d at 1013.

A manifestation of mutual assent to the terms of an agreement in an offer and acceptance is essential to the formation of a contract. *Stewart v. Professional Computer Centers, Inc.,* 148 F.3d 937, 939 (8th Cir.1998); *Schaer v. Webster County,* 644 N.W.2d 327, 338 (Iowa 2002). Mutual assent is determined from objective evidence. *Schaer,* 644 N.W.2d at 336. When interpreting a settlement agreement the primary concern is to determine the intention of the parties; "[e]vidence of the parties' *mutual* intent is what matters." *Peak,* 799 N.W.2d at 544 (emphasis original).

> In searching for that intention, we look to what the parties did and said, rather than some secret, undisclosed intention they may have had in mind or which occurred to them later.

*Id.* (quoting *Waechter,* 454 N.W.2d at 568). "[T]he situation and relation of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein ... and the course of dealing between the parties" are all relevant to this process. *Id.* (quoting *NevadaCare, Inc. v. Dept. of Human Servs.,* 783 N.W.2d 459, 466 (Iowa 2010)).

In Iowa there is a rebuttable presumption that an attorney representing a party in litigation has the power to bind the client to a settlement agreement. *Gilbride v. Trunnelle,* 620 N.W.2d 244, 251 (Iowa 2000) (citing Iowa Code § 602.10114). No question is raised about the authority of the attorneys for Westlake and MLP to negotiate a settlement of this case. Generally, a party bears the risk of a mistake by its counsel in negotiating a settlement agreement. *Christianson v. Henderson,* 2000 WL 33364122, at *5 (S.D.Iowa 2000).

Absent fraud or other inequitable conduct a unilateral mistake of fact or law by a party is insufficient to avoid a settlement agreement. *See Christianson,* 2000 WL 33364122, at *5; *Peak,* 799 N.W.2d at 545; *State ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 150 (Iowa 2001); *Wright,* 410 N.W.2d at 247.

**B.**

In a nutshell, MLP contends Westlake made a unilateral mistake in assuming its settlement offer included payment of the trust account $70,000 in addition to the $1.1 million. Westlake views itself as having been the victim of a bad faith "bait and switch."

*1. The Restatement*

The situation here is appropriately viewed as a misunderstanding concerning the parties' expressions of mutual assent to the settlement agreement. In some circumstances a misunderstanding as to what was offered and accepted is nonetheless contractually enforceable in conformity with the meaning attached to the offer and acceptance by one of the parties. *Restatement (Second) of Contracts ("Restatement")* § 20 states the operative principle:

> (1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and
>
>> (a) neither party knows or has reason to know the meaning attached by the other; or
>>
>> (b) each party knows or each party has reason to know the meaning attached by the other.

(2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

    (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or

    (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

The Iowa courts have looked to *Restatement* § 20 for guidance. *Harper v. Cedar Rapids Television Co., Inc.*, 244 N.W.2d 782, 789 (Iowa 1976); *Shaw v. Buser*, 770 N.W.2d 851, 2009 WL 1066777, at *6–7 (Iowa App. April 22, 2009) (Table case).

MLP and Westlake by their counsel manifested mutual assent to the terms of the settlement agreement dictated into the record at the September 27 final pretrial conference and memorialized later that day in their Memorandum of Understanding. As it concerned the amount to be paid to Westlake, MLP intended Mr. McCurdy and Mr. Porta and the primary insurer would pay $1.1 million part of which with respect to the individuals' contribution would be the $70,000 in subcontractor settlement proceeds held in the trust account. (Def. Mem. [674–1] at 7). In addition, subcontractor contributions negotiated by Mr. Stone would be paid to Westlake. With respect to the trust account $70,000 this intent was not disclosed to Westlake. For its part, Westlake understood MLP's offer to mean $1 million would be paid by MLP's primary insurer and $100,000 from MLP's principals, Mr. McCurdy and Mr. Porta. In addition it would receive $1,807,500 from the subcontractors which included the trust account $70,000 as reported by Mr. Stone in his September 27 communication to have been offered by MLP.

Whether Westlake's understanding of MLP's offer prevails turns on the application of subsection (2)(b) of *Restatement* § 20. If Westlake had no reason to know its understanding of the offer was mistaken and MLP had reason to know Westlake was mistaken and did not correct Westlake's misunderstanding, MLP is bound to the offer as understood by Westlake. Conversely, if Westlake had reason to know its understanding was mistaken, or MLP had no reason to know of Westlake's mistaken understanding, there was no enforceable manifestation of assent with respect to the trust account $70,000 and it is not part of the settlement agreement MLP and Westlake both agree exists.

The *Restatement* defines "reason to know" as follows:

    b. "Reason to know." A person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist. A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.

*Restatement* § 19 cmt. b; *see id.* § 20 cmt. a. The principle adopted in *Restatement* § 20(2)(b) has had a similar counterpart in Iowa law for a long time. Over a hundred years ago the Iowa Supreme Court upheld an instruction which told the jury:

    [I]f the terms of the agreement were intended in a different sense by the parties to it, that sense was to prevail against either party in which he had

reason to suppose the other understood it.

*Wood v. Allen,* 111 Iowa 97, 101, 82 N.W. 451, 452 (1900); *see Lull v. Anamosa Nat. Bank,* 110 Iowa 537, 543, 81 N.W. 784, 786 (1900). The instruction had a statutory basis which still exists. *See Lull,* 110 Iowa at 543, 81 N.W. at 786 (citing Iowa Code § 4617 (1897)) (now codified at Iowa Code § 622.22 (2011));[5] *see also* 2 R. Lord, *Williston on Contracts* § 6:58 at 830–31 (4th ed. 2007) ("[T]he test of the true meaning of an offer or acceptance is not what the party making it thought it meant or intended to mean, but what a reasonable person in the position of the parties would have thought it meant."); 7 J. Perilla, *Corbin on Contracts* § 28.29 at 126, 137 (Rev. ed. 1993).

### 2. *Westlake's Reason to Know*

MLP's position, in effect, is that Westlake had reason to know all it would receive from Mr. McCurdy and Mr. Porta and MLP's primary insurance carrier was $1.1 million and that the trust account $70,000 was not part of the subcontractor proceeds Westlake would receive because its offer was clear in both respects. While it had offered the trust account $70,000 as part of the cash deal at the September 6–7 mediation, its offer was not accepted, it was under no obligation to offer the trust account money again, it was not expressly asked if the money was still on the table, and it said nothing afterwards to lead Mr. Stone or Westlake's counsel to believe that it was. In the September 25 offer Mr. Schwartz said his clients and primary insurance carrier would make a "total payment" of $1.1 million to Westlake. In addition Westlake would receive the settlement money *"now being offered* by the subcontractors with which Mr. Stone has

been negotiating." The trust account $70,000 amount was not "now" being offered by the subcontractors, nor had Mr. Stone been negotiating with the subcontractors who had paid the $70,000. The settlement summary dictated by Mr. Schwartz into the record at the September 27 final pretrial conference ("the September 27 summary") was that defendants and their primary insurance carrier would pay "a total" of $1.1 million in addition to which Westlake would receive "whatever money is being paid by the subcontractors on defendant's third-party claims" to which Mr. Schwartz added, "so we are receiving no money from the third-party defendants who haven't already settled." The third-party defendants "still in the case" would pay their settlement money to Westlake. The three subcontractors whose settlement proceeds were held in the trust account had "already settled" and were not "still in the case." The later Memorandum of Understanding incorporated essentially the same language as the September 25 email offer.

MLP's offer and the September 27 summary must be considered in light of the course of dealing during the settlement negotiations as well as the context in which the parties had engaged the services of a mediator to help them settle a complicated, multi-party case. *See Peak,* 799 N.W.2d at 543–44; *Restatement* § 20 cmt. b (resolving differences over meaning "necessarily requires interpretation of the language and other conduct of the parties in light of the circumstances.") At the September 6–7 mediation $1,687,500 was offered on behalf of MLP comprised of $1 million from the primary insurance carrier, $617,500 from the excess insurer, and the trust

---

**5.** The statute has been quite durable. From the 1851 Iowa Code to the present it has provided: "When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it." Iowa Code § 2401 (1851).

account $70,000. (Def. Reply Brief [689] at 2). The third-party defendant subcontractors in the aggregate offered $1,312,500, making a total cash offer to Westlake of $3 million. (*Id.*) Westlake insisted MLP's principals, Mr. McCurdy and Mr. Porta, contribute which they declined to do. Thus, at the time neither side viewed the trust account $70,000 as a payment by Mr. McCurdy and Mr. Porta.

When settlement discussions continued after the mediation the main sticking point between MLP and Westlake was Westlake's insistence that Mr. McCurdy and Mr. Porta contribute to the settlement. That in fact proved to be the last significant hurdle to settlement. The emails that passed between Mr. Stone on the one hand and Messrs. Schwartz and Koehler on the other in the lead-up to the offer of September 25 make this clear. (*See also* Pl. Ex. D). When Mr. Schwartz made the September 25 offer it was reasonable for Westlake's counsel to believe that the $100,000 in addition to the primary insurance carrier's contribution was the sought-after contribution from Mr. McCurdy and Mr. Porta. That the offer was conditioned on reimbursement of the $100,000 from money recovered by the excess insurance carrier was consistent with this understanding. In fact, the settlement agreement drafted by the parties states the $100,000 is to be paid by Mr. McCurdy and Mr. Porta. Neither Mr. Stone nor Westlake's counsel had any reason to know MLP intended the $100,000 to be paid by Mr. McCurdy and Mr. Porta would be

funded in large part with the trust account $70,000.

That leaves the question of what Westlake understood would happen to the trust account $70,000. The money was put on the table at the September 6–7 mediation.[6] It is true MLP was under no obligation to keep it there as negotiations continued. The structure of the evolving settlement changed with the carve-out of the excess insurance carrier, but that Westlake would receive the third-party settlement money was a consistent theme. That the trust account $70,000 was not expressly withdrawn during the course of the negotiations or in response to Mr. Stone's September 16 email announcing the subcontractor $1,807,500 settlement package with its request the recipients "remember the amounts you told me," together with Mr. Stone's experience as a mediator in multi-party construction disputes led him to assume the trust account $70,000 was still committed as part of the subcontractor component of the settlement package.

Westlake accepted MLP's September 25 offer relying on the information from Mr. Stone that $1,807,500 had been offered by the subcontractors. The September 27 spreadsheet sent by Mr. Stone further informed Westlake's counsel that this figure included the trust account $70,000. As they finalized the settlement on September 27 Mr. Eckley or Mr. Lantz had in hand a printed copy of the spreadsheet.

The only reason Westlake would have had to know the trust account $70,000 was

---

**6.** MLP argues the trust account $70,000 was "defendants' money to keep and use as they wished." (Def. Memorandum [674–1] at 7). As Westlake points out, MLP's primary insurer would have had a subrogation interest in the $70,000 and the three subcontractors who contributed to it remained exposed to contribution claims which the insurance carrier had agreed to indemnify. (Pl. Mem. [675–2] at 19 n.15; Def. Reply [689] at 11). It is

evident the $70,000 was retained in the trust account with the idea that it would help fund a comprehensive settlement. At the core of the misunderstanding between the parties is MLP's intent that the trust account $70,000 would be part of the payment by Mr. McCurdy and Mr. Porta and Westlake's understanding that the trust account would be paid to it as part of the third-party subcontractors' settlement payments it was to receive.

not included with the other subcontractors' settlement money was what was said about the "total payment" from MLP and the subcontractor payments in the September 25 offer and the September 27 summary. Whether the "total payment" from MLP precluded an additional payment of the trust account $70,000 depends on whether the trust account amount is viewed as a payment by the settling subcontractors from whom the money originated. Payment by MLP or payment by the subcontractors; either view is reasonable in context. The descriptions about the subcontractor payments also did not unambiguously exclude the trust account if as Mr. Stone, and after receipt of his September 27 spreadsheet, Westlake, believed it was subcontractor settlement money "still on the table" as part of the subcontractor contribution package Mr. Stone had been putting together.

For the purposes of the "reason to know" definition in *Restatement* § 19 cmt. b Westlake's counsel, Mr. Eckley and Mr. Lantz, were "person[s] of superior intelligence" to be expected to act accordingly. Viewed in isolation the language used in the September 25 offer and the September 27 summary to describe the subcontractor payments, though not definitive, would have alerted experienced lawyers to the possibility MLP did not intend the trust account $70,000 would be paid as a subcontractor settlement contribution in addition to the $1.1 million paid on behalf of MLP. The language employed, however, must be viewed in context with the other information counsel had as well as the history of the negotiations and the complexity of the settlement that was coming together on September 27. Mr. Eckley and Mr. Lantz were aware of Mr. Stone's spreadsheet as the parties negotiated the Memorandum of Understanding which clearly showed the trust account $70,000 was included among the subcontractor payments. MLP's lawyers presumably had the same document.

Indeed counsel discussed including the spreadsheet contributions in the Memorandum of Understanding. The parties agreed that the partial satisfaction of the consent judgment would be $2,907,500, an amount which incorporated the subcontractor contributions reported by Mr. Stone including the trust account $70,000. Mr. Eckley and Mr. Lantz could reasonably have believed that MLP's counsel would say something if Mr. Stone's spreadsheet was inaccurate with respect to payment of the trust account money. Viewed in light of all of the surrounding circumstances, Mr. Eckley and Mr. Lantz were not bound to draw the contrary inference from the language used in the September 25 offer or September 27 summary that the $70,000 would not be separately paid as part of the subcontractor component of the settlement package. *Restatement* § 19 cmt. b.

### 3. *MLP's Reason to Know*

The remaining question is whether MLP had reason to know the meaning given to its offer by Westlake, again, that it would receive $1 million from MLP's primary insurance carrier, $100,000 from Mr. McCurdy and Mr. Porta, and, following receipt of Mr. Stone's spreadsheet, the trust account $70,000 paid as part of the subcontractor contribution to the settlement package. Clearly, given Westlake's consistent insistence that MLP's principals contribute to the settlement and MLP's consistent rejection of that demand, MLP had reason to know that when it finally offered an additional $100,000 Westlake would assume it came from Mr. McCurdy and Mr. Porta, particularly when the offer was conditioned on reimbursement of that amount from any recovery from the excess insurance carrier. That MLP had reason to know Westlake understood the offer it accepted to mean the trust account $70,000 would be paid separately as a subcontrac-

tor contribution presents a closer question. If MLP's counsel, Mr. Schwartz or Mr. Koehler, were aware of the content of Mr. Stone's spreadsheet during the negotiation of the Memorandum of Understanding on September 27, there would be no question but that MLP had reason to know Westlake understood its offer to include separate payment of the $70,000 as part of the subcontractor settlement contribution. As noted, in his declaration and statements at argument Mr. Schwartz states he did not review the spreadsheet on September 27, and only became aware of it some time later. Mr. Koehler's declaration is silent leaving only speculation.

The Court will take it that neither Mr. Schwartz nor Mr. Koehler reviewed or were aware of the content of the settlement contribution spreadsheet sent to them by Mr. Stone on the morning of September 27 or, more importantly, during the negotiation of the Memorandum of Understanding that afternoon. The Court concludes MLP, through its counsel, nonetheless had reason to know of the misunderstanding of its offer as reflected in the spreadsheet. "Reason to know" does not require that MLP had conscious knowledge that Mr. Stone and Westlake misunderstood the offer. *Restatement* § 19 cmt. b. MLP had reason to know of MLP's misunderstanding of the meaning of its offer if it "had information from which a person of ordinary intelligence [or superior intelligence] would infer" the meaning given to its offer by Westlake. *Id.* MLP's counsel are also persons of superior intelligence. Mr. Schwartz and Mr. Koehler had received Mr. Stone's email with its spreadsheet purporting to summarize "the final amounts committed to the settlement." They would have been aware Mr. Eckley and Mr. Lantz had the same email and might rely on Mr. Stone's summing up of the monetary aspects of the settlement since that customarily is an important part of a mediator's job.[7] MLP had the information from which a person of ordinary intelligence, and certainly one of superior intelligence, would infer its offer had been misunderstood by both Westlake and the mediator. (*Id.*) That MLP did not review the information with which it had been provided should not shift the consequence of the misunderstanding to Westlake.

### 4. *Ultimate Findings and Conclusions*

In light of the foregoing the Court finds and concludes that Westlake had no reason to know it misunderstood MLP's manifestation of assent as reflected in its offer when considered in light of all the surrounding circumstances. MLP on the oth-

---

7. The Court agrees with MLP that Mr. Stone did not act as its agent in conveying settlement terms. In Iowa a lawyer-mediator serves as a third-party neutral to assist the parties in resolving a dispute. Iowa R. Profess. Conduct § 32:2.4 & cmt. 1. The concept of a "neutral" is incompatible with that of an agent for a party. *See Moss v. Parr Waddoups Brown Gee & Loveless*, 2008 UT App. 405, 197 P.3d 659, 665 (Utah App.2008).

Mediators do, however, act as intermediaries for parties in presenting offers to settle and informing the parties what has been agreed to. What at the final hour Mr. Stone had to say about the amounts MLP and the subcontractors had committed to the settlement was an important communication. The Court can understand that last minute preparations for the final pretrial conference on September 27, and with at the same time many emails and telephone calls going back and forth between the parties, counsel and their clients, things were a little chaotic. (*See* Def. Exs. 18, 19). In the middle of all of this Mr. Stone's email and accompanying spreadsheet may not have been given immediate attention by counsel for MLP or Westlake on the morning of September 27. The pot was off the stove, however, on the afternoon of September 27 when counsel for Westlake and MLP gathered to finalize the details of their settlement. The purpose of their meeting was to give deliberate attention to the settlement terms.

er hand had information which gave it reason to know of Westlake's misunderstanding. The misunderstanding was not corrected. MLP is, accordingly, bound to its offer as understood by Westlake.[8]

### C.

Westlake contends MLP's position with respect to the trust account $70,000 has been in bad faith and characterized by dilatory tactics which have delayed the ultimate resolution of this case by trial of the remaining third-party claim against Fieldstone. (Pl. Mem. [675–2] at 27). Westlake argues there is no reason why MLP should not have carried out the undisputed portions of the settlement agreement as Westlake had requested, and the hold up has resulted in damage in terms of additional attorney fees, financing and interest expense on loans to repair the Westlake property for which it ought to be compensated by sanction. (*Id.*) In prior conference with counsel the Court declined to order MLP to immediately perform the undisputed aspects of the settlement agreement (principally payment of the $1.1 million and the assignment of the third-party claim against Fieldstone) after consideration of the reasons put forward by MLP why it should not be compelled to do so while the dispute concerning the trust account money was unresolved. MLP did agree settlement of the third-party claims should go forward with payment of the third-party settlement amounts (excluding the trust account money) to Westlake and that has been accomplished following court order.

The record does not support a finding that MLP's position in this dispute was in bad faith warranting a monetary sanction.

The Court would require the parties to each bear their own attorney fees in connection with resolution of the present dispute but for the fact both requested prevailing party attorney fees under the terms of their settlement agreement. Part of the draft settlement agreement to which both parties have agreed provides that "[i]n any litigation related to this Agreement, the prevailing party shall be entitled to his or its reasonable attorney fees, expenses and taxable court costs." (Pl. Ex. C at 16; Def. Exs. 8 at 15, 22 at 17). Westlake is the prevailing party on the cross motions. By the terms of the settlement agreement the Court is required to consider an award of prevailing party attorney fees. If Westlake wishes to pursue these it shall submit an itemized statement of fees and expenses claimed in conformity with Fed.R.Civ.P. 54(d)(2), LR 54.1.a, as provided below. MLP may respond within the time provided in the local rules for response to a motion.

### III.

### RULINGS AND ORDERS

Defendants' motion to compel/enforce their settlement agreement with plaintiff [674] is **granted in part and denied in part.** Plaintiff's motion to enforce settlement agreements [679] is **granted.**

IT IS ORDERED that MLP and Westlake shall execute the Settlement and Release Agreement (the "agreement") to which they have agreed incorporating the findings above with respect to the trust account $70,000. MLP may execute the agreement with a reservation of rights with respect to all provisions relating to

8. Westlake argues that even if its misunderstanding was a unilateral mistake, the settlement agreement should be reformed consistent with its understanding of the terms because its mistake was induced by MLP's fraudulent nondisclosure of its intent con-

cerning disposition of the trust account $70,000. The Court does not believe MLP's conduct amounts to fraudulent nondisclosure, a subject embraced in subsection (2)(a) of *Restatement* § 20 which the Court has found not applicable. *See id.* cmt. d.

the trust account money. Westlake and MLP shall perform their undertakings in the agreement, including specifically the payment of money, consent judgment, partial satisfaction, dismissals, releases, and assignment of the third-party claim against Fieldstone within twenty (20) days of the date hereof.[9]

IT IS FURTHER ORDERED that Westlake may submit a claim for attorney fees and expenses in connection with the proceedings on these motions within fourteen (14) days of the date hereof.

IT IS SO ORDERED.

---

**9.** At hearing Westlake asked the Court to consider under the authority of Fed.R.Civ.P. 54(b) carving out the trust account $70,000 issue in a separate judgment so that any appeal would proceed on that issue alone with the remainder of the settlement agreement subject to immediate enforcement. The Court is uncertain this would accomplish what Westlake intends or is procedurally appropriate at this point. Unless an order is entered under Fed.R.Civ.P. 54(b) the ruling and order above are not a final judgment because the third-party claim against Fieldstone remains and has yet to be assigned. MLP as the party adversely affected by this ruling would be the party to bring a Rule 54(b) motion if it thought necessary to permit an appeal. That, or a motion under Fed.R.Civ.P. 62, would present the occasion to consider what should go forward on any appeal and what should be enforced presently. It is premature to address these issues now.