# IN THE COURT OF APPEALS OF IOWA

No. 14-1274
Filed October 28, 2015

**NATIONAL SURETY CORPORATION,**
        Plaintiff-Appellant/Cross-Appellee,

**vs.**

**WESTLAKE INVESTMENTS, LLC,**
        Defendant-Appellee/Cross-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson (August and December 2013 summary judgment rulings) and Eliza J. Ovrom (February 2014 summary judgment, limine, trial, and posttrial rulings), Judges.

National Surety Corporation appeals the district court's summary judgment and post-trial rulings and the jury's verdict, and Westlake Investments, LLC, cross-appeals the district court's post-trial rulings. **AFFIRMED ON APPEAL; REVERSED AND REMANDED ON CROSS-APPEAL.**

Todd S. Schenk and Amber Coisman of Tressler LLP, Chicago, Illinois, and Mollie Pawlosky of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellant/cross-appellee.

Todd M. Lantz of Weinhardt & Logan P.C., and Steven R. Eckley of Belin McCormick, P.C., Des Moines, for appellee/cross-appellant.

Jeffrey A. Stone of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for amici curiae Hubbell Realty Company, Home Builders Association of Iowa, and Associated Builders & Contractors of Iowa.

Brenda K. Wallrichs of Lederer Weston Craig PLC, Cedar Rapids, for amici curiae American Insurance Association and Property Casualty Insurers Association of America.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

This declaratory judgment action was precipitated by a commercial construction dispute and resulting federal civil action, which culminated in a consent judgment entered in favor of Westlake Investments, LLC. In this appeal, we are asked to consider coverage terms in a commercial general liability insurance contract, and whether the excess insurer, National Surety Corporation, is liable to indemnify Westlake under the policy. NSC challenges the district court's interpretation of the term "occurrence" in the policy and the jury's verdict following trial. Westlake challenges the district court's post-trial ruling on the issue of pre-judgment interest. We affirm on appeal and reverse and remand on cross-appeal.

## I. *Background Facts and Proceedings*

In 2003, Westlake Investments, LLC, entered negotiations to purchase Westlake Apartments, a 300-unit apartment complex in West Des Moines, while the complex was under construction.[1] The developers (collectively, MLP Management, LLC) guaranteed the construction would be "first class and of workmanlike quality." MLP purchased a primary commercial general liability (CGL) policy with a $1,000,000 policy limit from Arch Insurance Group, effective July 1, 2003, to July 1, 2004.[2] MLP also purchased an excess CGL policy with a limit of $25,000,000 from National Surety Corporation for the same period. The NSC policy "followed form" with the Arch policy.

---

[1] Pioneer Construction, Inc. was the general contractor for the 300-unit Westlake apartment complex, and independent subcontractors did all building, excavating, designing, and engineering. Construction took place between 2002 and 2003.

[2] The policy listed an "Effective Date" of "7/1/03" and an "Expiration Date" of "7/1/04."

Prior to the closing of the sale, Westlake and MLP discussed issues with the complex, including reported water penetration in certain units. The issues were considered aesthetic and did not hamper negotiations. The sale closed in November 2003. However, latent construction defects continued to cause a myriad of problems, including widespread water penetration and mold.

In 2008, Westlake brought suit in federal district court against MLP,[3] seeking to recover millions of dollars in lost profits, repair costs, and other damages under tort and contract theories. *See*, *e.g.*, *Westlake Investments*, *LLC v. MLP Mgmt.*, *LLC*, 842 F. Supp. 2d 1119, 1121 (S.D. Iowa 2012). MLP in turn sued numerous third-party defendants (collectively, the subcontractors),[4] raising claims of defective construction. *See id.*

MLP's primary insurer, Arch, undertook MLP's defense. Following extensive discovery, numerous motions, and mediation, the lawsuit eventually culminated in a settlement agreement between Westlake and MLP. A consent judgment for $15,600,000 was entered on February 2012, of which Arch agreed to pay its policy limit of $1,000,000, and $1,737,500 was satisfied by MLP and third-party defendant subcontractors, leaving $12,762,500 unsatisfied. The

---

[3] The named defendants were the property's developers and the project's general contractor, including: MLP Management, LLC; MLP Investments, LLC; Pioneer Construction, Inc.; CCC/MLP Westlake, LLC; Westlake Apartments, LLC, Joe Leibold, Stan McCurdy, John Porta; MLP Multi-Family Construction, LLC; Westlake Apartments, LP; Pioneer Construction Services, Inc.; MLP Land Development LLC; CCC/Westlake Apartments, LLC; and CCC/MLP Investment, LLC.

[4] The named third-party defendants were the project's subcontractors and architect, including: All State Gutter, Inc.; Fieldstone Products, LLC; Jordison Construction, Inc.; R & R Building Products; Solar Industries, Inc.; C. Bennett Building Supplies, Inc.; McAninch Corporation; Production Heating Services, Inc.; Community Wholesale of Des Moines Iowa, Inc.; Senninger Plumbing Company, Inc.; TKP Contracting Company, Inc.; and Jim E. Parker, Parker Associates.

consent judgment assigned all rights MLP had against its excess insurer, NSC, to Westlake.

Meanwhile, NSC initiated this action by filing a declaratory judgment action in Polk County district court, seeking a ruling that it had no duty to indemnify Westlake for any amounts awarded to Westlake in the underlying federal action. Westlake counterclaimed for breach of contract and sought a ruling that NSC owed coverage for the entire consent judgment.

Following discovery, the parties filed several motions for summary judgment. In essence, NSC contended the NSC policy did not provide coverage for Westlake's claimed damages (among other claims, NSC argued the damages sought by Westlake in the underlying action were not the result of "property damage" caused by an "occurrence" as required for coverage by the policy). Westlake countered, claiming defective construction could be an "occurrence" under the policy.

In August 2013, following a hearing, the district court entered a ruling (August 2013 ruling) granting Westlake's motion for partial summary judgment and denying NSC's motion for summary judgment, determining in part that "defective subcontractor work may be an 'accident' and therefore an 'occurrence' under a post-1986 CGL policy written to a general contractor."

Westlake filed a second motion for summary judgment, claiming the "damage to construction projects" exclusion and "owned property" exclusion in the policy did not apply. NSC countered that the exclusions did apply because damage to the complex took place during construction and while MLP still owned the complex.

In December 2013, following a hearing, the district court entered a ruling (December 2013 ruling) granting Westlake's second motion for partial summary judgment, determining in part that the owned property exclusion in the policy did not apply to the consent judgment because "at the time of the property damage alleged by Westlake, the Westlake complex was not owned by any named insured."

Westlake filed a third motion for summary judgment, claiming the "alienated premises" exclusion and "mold and fungi" exclusion in the policy did not apply. Westlake also sought a ruling that MLP could not allocate the consent judgment between property damaged during and outside the policy period. NSC countered and filed a motion for summary judgment, claiming NSC's liability was limited to property damage during the policy period.

In February 2014, following a hearing, the district court entered a ruling (February 2014 ruling) granting in part and denying in part Westlake's motion for summary judgment and denying NSC's motion for partial summary judgment, determining in part that fact issues remained on the fungi and allocation issues. The court declined to revisit the parties' contentions with regard to the meaning of the term "occurrence" in the policy.

The case proceeded to a three-week jury trial, during which numerous witnesses testified and hundreds of exhibits were admitted. The jury returned a verdict in favor of Westlake, awarding Westlake $12,439,500 (the $15,600,000

consent judgment minus the amount satisfied from other sources).[5] The district court entered judgment against NSC per the jury verdict.

NSC filed several post-trial motions, which the district court denied following a hearing. Westlake also filed several post-trial motions regarding pre- and post-judgment interest, which the district court denied.

NSC appeals; Westlake cross-appeals.

## II. Scope and Standards of Review

We review for legal error when the question on appeal is how to interpret an insurance policy. *Boelman v. Grinnell Mut. Reins. Co* ., 826 N.W.2d 494, 500-01 (Iowa 2013). Likewise, we review the district court's rulings on summary judgment for correction of legal error. Iowa R. App. P. 6.907; *Nationwide Mut. Ins. Co. v. Kelly*, 687 N.W.2d 272, 274 (Iowa 2004). A grant of summary judgment is proper when the moving party shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *Boelman*, 826 N.W.2d at 501. When reviewing the grant of summary judgment, we examine the record in the light most favorable to the nonmoving party. *See id.*

We also review challenges to the jury instructions for correction of errors at law. *See Estate of Pearson ex rel. Latta v. Interstate Power & Light Co.*, 700 N.W.2d 333, 340 (Iowa 2005). We review the related claim that the trial court should have given a requested instruction for an abuse of discretion. *See Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006), *but see Tamco*

---

[5] Third-party defendant Fieldstone did not join in the settlement; following a bench trial, Westlake's litigation with Fieldstone resulted in a judgment in Westlake's favor for $253,000.

*Pork II, LLC v. Heartland Co-op*, No. 14-0412, 2015 WL 4481571, at *2-5 (Iowa Ct. App. July 22, 2015) ("There is a lurking inconsistency in our law regarding the scrutiny applied to the district court's refusal to give a requested jury instruction.").

If a jury verdict is not supported by sufficient evidence and fails to effectuate substantial justice, a new trial may be ordered. *See Olson v. Sumpter*, 728 N.W.2d 844, 850 (Iowa 2007). Evidence is substantial when reasonable minds would accept the evidence as adequate to reach the same findings. *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009). Evidence is not insubstantial merely because it would have supported contrary inferences. *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000).

We apply an errors-at-law review to the calculation and award of prejudgment interest. *See Gosch v. Juelfs*, 701 N.W.2d 90, 91 (Iowa 2005). "If there is substantial evidence in the record to support the trial court's decision, we are bound by its fact-findings." *Id.* "We are not bound, however, by the trial court's application of legal principles." *Id.* We strictly construe "Iowa statutes providing for recovery of costs." *Hughes v. Burlington N. R.R. Co.*, 545 N.W.2d 318, 321 (Iowa 1996).

### III. *Coverage under the NSC policy*

The question presented by NSC's appeal is whether the commercial general liability policy purchased by MLP provided coverage for the damages incurred by Westlake following widespread water penetration in Westlake

Apartments.[6] Among other claims, NSC challenges the district court's ruling that the construction defects at the Westlake Apartments, and the resulting damage, could be an "occurrence." Westlake counters, claiming the district court correctly allowed the jury to decide the "occurrence" issue. NSC also claims the jury's finding that all the property damage occurred during the policy period is not supported by substantial evidence.

Contract interpretation requires us to assign meaning to the words in the policy. *Boelman*, 826 N.W.2d at 501. If the policy does not define the words in question, we assign their ordinary meaning. *Id.* "The plain meaning of the insurance contract generally prevails." *Id.* Contract construction is giving the policy its legal effect. *Id.* In construing a contract, the intent of the parties controls, and "except in cases of ambiguity this is determined by what the policy itself says." *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 681 (Iowa 2008). Policy language is ambiguous if it is fairly susceptible to more than one reasonable interpretation. *Id.* Our courts avoid "straining the words and phrases of the policy to impose liability that was not intended and was not purchased." *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987).

In this case, the NSC policy follows form with the Arch "primary" policy, and states:

> This coverage only applies to injury or damage covered by the **Primary Insurance**. The definitions, terms, conditions, limitations

---

[6] Westlake challenges several of NSC's claims on error preservation grounds. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (observing an issue is preserved for review if it has been raised and decided by the district court). Unless specifically set forth otherwise, we bypass these concerns and proceed to the merits of the claims. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing error preservation problem and proceeding to the merits of the appeal).

and exclusions of the **Primary Policies**, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy . . . .

Subject to the other provisions of this policy, **We** will pay on behalf of the **Insured** those sums in excess of **Primary Insurance** that the **Insured** becomes legally obligated to pay as damages. . . .

**A. OCCURRENCE FORM**
If a **Primary Policy** applies on the basis of . . . damage which occurs during the period of that policy, then this coverage shall only apply on the same basis and in a like manner to injury or damage which occurs during **Our Policy Period**.

The Arch policy provides in pertinent part:

**1. Insuring Agreement**
    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. . . . This insurance applies only to . . . "property damage" which occurs during the policy period. The . . . "property damage" must be caused by an "occurrence." The "occurrence" must take place in "coverage territory."
    . . . .
"Property damage" means:
    a. Physical injury to tangible properly, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of physical injury that caused it; or
    b. loss of use of tangible property that is not physically injured. All such loss will be deemed to occur at the time of the "occurrence" that caused it.

"Occurrence" was defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policy does not define "accident," but the Iowa Supreme Court has. In *Pursell Construction, Inc. v. Hawkeye–Security Insurance Co.*, the court explained that in the context of insurance policies, the word "accident" means,

an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force . . . . [G]iving to the word the meaning which a man of average understanding would, we think ["accident"] clearly

implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune.

596 N.W.2d 67, 70 (Iowa 1999) (citation and quotation marks omitted).

In *Pursell*, a contractor (Pursell Construction, Inc.) brought a declaratory judgment action against its insurer, seeking coverage under its CGL policy for claims brought against the contractor by a developer. *Id.* at 68. The developer had sued Pursell for breach of contract and negligence, alleging that the contractor improperly constructed two houses at an elevation below a floodplain. *Id.* Pursell sought coverage under its CGL policy, which provided coverage for "'property damage' . . . caused by an 'occurrence.'" *Id.* at 69. "The [CGL] policy define[d] 'occurrence' as 'an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions.'" *Id.* at 70. The court noted that the developer's claim against Pursell was "essentially one for defective workmanship." *Id.* The court adopted the "majority rule" and held "that defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy." *Id.* The court explained that "the damages [the developer] seeks are limited to the very property upon which Pursell performed work" and "were not the result of an 'occurrence' as defined in the policy." *Id.*

The Eighth Circuit Court of Appeals later discussed the Iowa law distinction between an accident and faulty workmanship:

> Without qualm, the *Pursell* court explained that negligent conduct itself, although it may ultimately result in injury or damage to a victim, does not fall within the ordinary meaning of an accident. (That is not to say that negligence cannot be the cause of an accident.) . . . We therefore hold that defective workmanship,

regardless of who is responsible for the defect, cannot be characterized as an accident under Iowa law.

*Norwalk Ready Mixed Concrete, Inc. v. Travelers Ins. Cos.*, 246 F.3d 1132, 1137 (8th Cir. 2001); *see also Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1176 (8th Cir. 2011) (reaffirming that under Iowa law, defective workmanship cannot be considered an accident, and therefore an occurrence, and holding property damage due to defective windows was not an occurrence).

In *Pursell*, the court found no occurrence, and consequently no coverage, because the only damage alleged from the defective workmanship (failure to construct basement floors at the proper elevation) was to the work product itself. 596 N.W.2d at 71. "The parties stipulated there was no physical damage to the house." *Id.* at 70. But *Pursell* does not address whether a liability policy provides coverage where faulty workmanship causes property damage to something other than the insured's work product as the result of an unintended and unexpected event. *See, e.g.*, *Auto-Owners Ins. Co. v. Home Pride Cos.*, *Inc.*, 684 N.W.2d 571, 578 (Neb. 2004) (finding damage to roof structures from faulty installation of shingles was caused by "occurrence" within meaning of CGL policy); *see also Peterson Contractors*, *Inc. v. Travelers Indem. Co.*, No. C14-0063, 2015 WL 4079371, at *6 (N.D. Iowa July 2, 2015) (holding cofferdam failure in the midst of construction was an accident and therefore an occurrence covered under the CGL policy).

Here, the jury was instructed:

> [T]o prove the National Surety policy covers the consent judgment damages, Westlake must show that:
> 1. Some or all of the consent judgment damages resulted from "property damage" that was caused by an "occurrence," and

2. Some or all of the consent judgment damages resulted from "property damage" that happened between July 1, 2003 and July 1, 2004.

Jury Instruction No. 19.

As used in Instruction No. 19, "property damage" means physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

You are instructed that property damage happened at the Westlake apartment complex at some point in time due to water intrusion. You must determine whether property damage happened during the policy period of July 1, 2003 to July 1, 2004.

Jury Instruction No. 20.

As used in Instruction No. 19, an "occurrence" is an accident, including continuous or repeated exposure to substantially the same general harmful conditions. Defective construction work performed by an insured is not covered by the policy; however, defective construction work performed by subcontractors may be an "occurrence" under the policy.[7]

"Accident" means an unplanned, sudden, and unexpected event.

Whether something is an "accident" must be determined from the viewpoint of the insureds and what they intended or should reasonably have expected. An accident is unexpected so long as the insured does not expect both it and some damage.

Jury Instruction No. 21.

*A. Occurrence.* Here, unlike the *Pursell* situation, Westlake alleged property damage beyond the work product itself, including water penetration resulting in widespread water damage. *See Sickler v. Auto Owners Ins. Co.*, No. 14-1636, 2015 WL 4935710, at *1 (Iowa Ct. App. Aug. 19, 2015) (observing the insured alleged consequential damages beyond the work product itself—i.e., the negligent overhaul of his truck engine—due to property damage he later

---

[7] The subcontractor exception to the property damage exclusions will be discussed below.

sustained when his truck engine failed); *but see Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995) ("In addition to damages to the residence itself, the Yegges claim only emotional distress. There was no coverage for this claim . . . ."); *Strotman Bldg. Ctr., Inc. v. W. Bend Mut. Ins. Co.*, No. 98-1525, 1999 WL 975842, at *2 (Iowa Ct. App. Oct. 27, 1999) ("The act giving rise to the claim here was not injury to the home, but Strotman's asserted failure to properly build the home."). Starting with the assumption that from the viewpoint of the insureds the work would be completed properly, then the damages were unforeseeable and constituted an "accident" and therefore an "occurrence" within the meaning of the CGL policy. *See, e.g.*, *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 170 (Ind. 2010) (declining to follow *U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1228 (Ariz. Ct. App. 1989), on this issue as followed by the court in *Pursell*, 596 N.W.2d at 71). Under these facts, we find no error in the district court's decision to allow the jury to decide whether Westlake's damages were caused by an "occurrence." *But see W.C. Stewart Constr., Inc. v. Cincinnati Ins. Co.*, No. 08-0824, 2009 WL 928871, at *3-4 (Iowa Ct. App. 2009) (finding subcontractor's defective grading that caused building movement and cracks was not an occurrence under CGL policy)[8]; *Cont'l W. Ins. Co. v. Jerry's Homes, Inc.*, 04-1890, 2006 WL 228917, at *4 (Iowa Ct. App. 2006) (affirming summary judgment entered in favor of insurance company

---

[8] As the district court observed, *W.C. Stewart* is distinguishable because although it involved subcontractor work on a construction site, the subcontractor carried its own CGL policy. *W.C. Stewart* is not persuasive is determining whether a subcontractor's defective workmanship could be an occurrence under a general contractor's CGL policy.

on claims against general contractor of defective subcontractor work upon finding inadequate factual record regarding the actual cause of damages).[9]

*B. Property Damage.* NSC challenges the determination that Westlake's claims constitute "property damage" within the meaning of the policy. The policy excluded from coverage:

> **j. Damage to Property**
> "Property damage" to:
> **(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
> **(2)** Premises you sell, give away, or abandon, if the "property damage" arises out of any part of those premises;
> **(3)** Property loaned to you;
> **(4)** Personal property in the care, custody or control of the insured;
> **(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the ''property damage'' arises out of those operations; or
> **(6)** That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.
> . . . .
> **Paragraph (2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented, or held for rental by you.
> . . . .
> **Paragraph (6)** of this exclusion does not apply to "property damage" included in the "products—completed operations hazard."

The completed operations hazard includes all "property damage" arising out of completed work. The policy also excluded:

---

[9] We acknowledge we have reached a different conclusion under these facts than the court did in *Jerry's Homes* under similar facts. The district court observed, "While *Jerry's Homes* discusses defective subcontractor work, its failure to appropriately discuss and analyze the CGL policy in light of the 1986 revisions, and the fact that summary judgment was affirmed based on an independent factual record render *Jerry's Homes* unpersuasive and not controlling in this case." The 1986 policy revisions, discussed below, and the facts of this case distinguish it from the ruling in *Jerry's Homes.*

*l*. **Damage to "your work"**

"Property damage" to "your work" arising out of it or any part of it and included in the "products—completed operation hazard".

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

. . . .

"Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts, or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

(Emphasis added.)

We observe the question of whether faulty workmanship of a subcontractor fits within the definition of "occurrence" under a CGL policy has been litigated in a number of jurisdictions. The insuring language and exclusions in standard CGL policies have been modified over the years, and the recent evolution of the standard CGL policy explains the focus on this particular issue. The 1986 revision to the policy added several exclusions, including (j)(6) and (*l*), which have an express exception for subcontractor work. Of jurisdictions that have analyzed the issue, the majority has decided inadvertent faulty workmanship of a subcontractor can be an "occurrence" covered by a CGL policy. *See, e.g.*, *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1282 (10th Cir. 2011) (discussing cases); *K & L Homes, Inc. v. Am. Family Mut. Ins. Co.*, 829 N.W.2d 724, 729-30 (N.D. 2013) (same).

"The subcontractor exception has been found to preserve coverage for liabilities arising from property damage involving a subcontractor in at least the following situations:

[1] A subcontractor's defective work causes damage to the insured's work.

[2] The insured contractor's defective work causes damage to the subcontractor's work.

[3] The defective work of one or more subcontractors causes damage to a subcontractor's work."

*K & L Homes, Inc.*, 829 N.W.2d at 739 (quoting Stephen N. Goldberg & James S. Carter Jr., *Liability Insurance for Construction Defects* in 3 *New Appleman Law of Liability Insurance* § 28.04[10] [a]-[b] (Matthew Bender 2d ed. 2012)).

"[A]n insurer has a duty to define any limitations or exclusionary clauses in clear and explicit terms. The burden of establishing an exclusion rests upon the insurer." *Allied Mut. Ins. Co. v. Costello*, 557 N.W.2d 284, 286 (Iowa 1996). Exclusions are strictly construed against an insurer. *Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa 2012). An exception to an exclusion from coverage results in coverage. *K & L Homes, Inc.*, 829 N.W.2d at 728. Prior to the 1986 revision, the subcontractor exception to the exclusion from coverage was an expansion of coverage or endorsement option; the revision added the subcontractor exception directly to the body of the CGL policy. *See* James Duffy O'Connor, *What Every Court Should Know About Coverage for Defective Construction*, 5 J. Am. C. Construction L. 1 n.15 (2011).

Here, the consent judgment was founded on monetary damages stemming from both physical injury to, and loss of use of, tangible property.[10] The damages were caused, in whole or large part, by faulty workmanship of

---

[10] Physically damaged property included plywood sheathing, drywall, windows, wood framing, stone veneer, moisture barriers, insulation, concrete paving, concrete drainage intakes, stairs, roofs, carpet, light fixtures, paint, nails, and staples.

subcontractors—property damage expressly covered by the CGL policy in this case. To be clear, the policy contained no endorsement modifying the property damage exclusions or eliminating the subcontractor exception. *See, e.g.*, *Essex Ins. Co. v. Holder*, 261 S.W.3d 456, 457-58 (Ark. 2007) (noting insurer issued policies that modified the definition of "occurrence" by listing several exclusions, including one for "defective construction"); *U.S. Fire Ins. Co. v. J.S.U.B.*, *Inc.*, 979 So. 2d 871, 884-85 (Fla. 2007) (noting the Insurance Services Office "has begun to issue an endorsement that may be included in a CGL policy, which entirely eliminates the subcontractor exception to the 'your work' exclusion" and "[t]he fact that these additional endorsements may be included in CGL policies highlights that the ultimate analysis is governed by the actual language contained in the applicable insurance contract").

Westlake presented substantial evidence with regard to repair costs and damage to Westlake's reputation which led to loss of use, lost profits, and lost rental income. The jury determined the consent judgment, in its entirety, was reasonable and prudent.[11] We affirm the jury's finding that Westlake's claim for physical injury and loss of use constitutes property damage caused by an occurrence within the meaning of the policy.[12]

*C. Policy Period.* NSC challenges the determination that Westlake's damages were due to property damage that happened during the policy period.

---

[11] To the question, "Did Westlake prove the consent judgment in the underlying action was reasonable and prudent in whole or in part?", the jury answered, "Yes." To the next question, "What amount of the consent judgment was reasonable and prudent?", the jury answered, "$15,600,000."

[12] The jury answered "Yes" to the question, "Did Westlake prove that some or all of the damages [of the consent judgment] were because of property damage that was caused by an 'occurrence' . . . ?"

Indeed, the policy provides: "This insurance applies only to . . . "property damage" which occurs during the policy period." The policy period was between July 1, 2003, and July 1, 2004. The jury determined the entirety of Westlake's damages "were because of property damage that happened between July 1, 2003 and July 1, 2004."

Upon our review, we conclude the jury's verdict is supported by sufficient evidence in the record. *See Olson v. Sumpter*, 728 N.W.2d 844, 850 (Iowa 2007). The evidence is replete with testimony and exhibits regarding problems with the complex both during and after the policy period. Several experts emphasized that the winter 2003-2004 as the critical time period in which the damage was done, and that the damage at Westlake existed by June 30, 2004. In other words, problems surfaced before the sale closed in November 2003, but continued for years after that time because they were not properly fixed or prevented.[13] *See, e.g.*, Allan D. Windt, *Insurance Claims and Disputes* § 11:4 (6th ed. 2013) (explaining that in almost all "occurrence"-type policies the trigger of coverage is defined as the date of the property damage; the date of the wrongdoing or injury-causing event is irrelevant). We conclude the evidence showed Westlake incurred property damage and loss of use continuously since the occurrence causing the damages. And although the water penetration was realized in some units and given some amount of attention during the policy period, it was not resolved.

---

[13] The testimony and evidence at trial supports a finding that in light of the decline in water penetration problems by November 2003, MLP believed any problems were fixed when the property was sold. After the winter 2003-2004, during the spring 2004, property damage due to water penetration took place.

Section I of the NSC policy, entitled "Coverages," states: "The amount We will pay for damages is limited as described in Section III – Limits of Insurance." Section III of the NSC policy states in relevant part:

> (1) The Limit of Insurance stated in the Declarations as applicable to "each occurrence" *shall be the total limit of Our liability for all damages arising out of any one occurrence*. That limit is the most We will pay regardless of the number of coverages, Insureds, persons or organizations sustaining injury or damage, or claims made or Suits brought.
> . . . .
> (3) This insurance shall apply only in excess of the applicable Limit of Liability shown in the Schedule of Primary Insurance attached to this policy.

(Emphasis added.) The NSC policy "Limits of Insurance" listed a $20,000,000 limit for "Each Occurrence" as well as a $20,000,000 aggregate.

Under these facts and circumstances, we conclude the jury's verdict that $12,439,500 in damages were because of property damage caused by an occurrence during the policy period is supported by sufficient evidence in the record and effectuates substantial justice between the parties.

*D. Exclusions.* NSC challenges the jury's finding that none of the exclusions apply to any part of the consent judgment. Specifically, NSC claims several exclusions and an endorsement in the policy exclude coverage. NSC had the burden to prove that all or some of the consent judgment damages were excluded from coverage by exclusions in the policy.

Exclusion j(5) of the policy states: "This insurance does not apply to: . . . 'Property damage' to [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are

performing operations, if the 'property damage' arises out of those operations."

The jury was instructed on this exclusion as follows:

> Exclusion j(5) in the Arch policy excludes coverage for property damage that happened during, and that arose out of, the construction of the Westlake Apartments.
> Construction was completed at the time the apartment complex was sold to Westlake.

Jury Instruction No. 30. During the three-week trial, the jury received evidence that damage to the complex took place during the winter of 2003-2004, after construction was complete. We conclude sufficient evidence supports the jury's verdict that none of the consent damages were due to property damage that happened "during" construction.

> The policy's exclusion j(2), the "Alienated Premises" exclusion, states:

> This insurance does not apply to: . . . 'Property damage' to [p]remises you sell, give away, or abandon, if the 'property damage' arises out of any part of those premises [but] this exclusion does not apply if the premises are 'your work' and were never occupied, rented, or held for rental by you.

The jury was instructed on this exclusion as follows:

> Exclusion j(2) in the Arch policy excludes coverage for property damage that arose out of any premises sold by CCC/MLP.
> There is an exception to exclusion j(2). The exception states that exclusion j(2) does not apply if the premises were never occupied, rented, or held for rental by CCC/MLP.

Jury Instruction No. 26. The evidence at trial showed that while MLP Management rented some units, CCC/MLP did not. Even if we abided by NSC's request to consider MLP Management the legal equivalent of CCC/MLP (which it is not), the jury was also instructed it "may consider exclusion j(2) only with respect to CCC/MLP's liability. This exclusion does not apply to Pioneer Construction." Accordingly, even if CCC/MLP's liability was excluded under j(2),

Pioneer's liability was still covered, which was sufficient for the entire judgment against NSC (Pioneer was jointly and severally liable for the consent judgment).

On the policy's endorsement 6, the "Earth Movement or Subsidence" exclusion, the jury was instructed:

> The Arch policy excludes coverage for damages arising out of the subsidence, settling, sinking, slipping, falling away, caving in, shifting, eroding, consolidating, compacting, falling, rising, tilting, or any other similar movement of earth or mud, regardless of whether such movement is a naturally occurring phenomena or manmade.

Jury Instruction No. 27. The jury received evidence regarding freeze/thaw cycles, but evidence specifying any "frost heave" at the apartment complex was equivocal at best. Furthermore, NSC failed to establish that any part of the consent judgment was attributable to earth movement damage. Assuming, without deciding, the earth movement exclusion is applicable under the circumstances, given the evidence presented at trial, the jury could have reasonably determined this exclusion did not apply.

On the policy's exclusion T, the "Fungi, Mold and Mildew" exclusion, the jury was instructed:

> The National Surety and Arch policies exclude coverage for damages arising, in whole or in part, out of, resulting from, caused by, or in any way related to fungi or bacteria, including mold or mildew, regardless of any other cause, event, material, product, and/or building component that contributed concurrently or in sequence to those damages.

Jury Instruction No. 28. Although mold and mildew subsequently developed at the complex, the jury received evidence that mold was not present at the time the property damage covered by the consent judgment occurred. And again, NSC failed to establish that any part of the consent judgment was attributable to mold

and mildew damage. Given the evidence presented at trial, the jury could have reasonably determined this exclusion did not apply.

On the policy's exclusion B, the "Contractual Liability" exclusion, the jury was instructed:

> Exclusion b in the Arch policy excludes coverage for damages because of "property damage" that CCC/MLP or Pioneer Construction was obligated to pay because they assumed such liability in a contract or agreement. National Surety contends this exclusion applies to the attorney fee damages in the consent judgment ($1 million).
>
> To "assume" liability refers to a situation where an insured assumed the liability of a third party, such as an agreement to indemnify or hold another party harmless. The Arch policy generally covers liabilities for breach of contract.
>
> There is an exception to exclusion b. The exception states that exclusion b does not apply to liability for damages that CCC/MLP or Pioneer Construction would have in the absence of the contract or agreement.

Jury Instruction No. 29. Paragraph 16 of the apartment complex purchase agreement authorizes Westlake to recover reasonable attorney fees if litigation occurs. In its first summary judgment ruling, the district court noted the contractual liability provision, stating:

> "[T]he insurance contract must contain any limitations or exclusionary clauses in clear and explicit language." *Shatzer v. Globe Am. Cas. Co.*, 639 N.W.2d 1, 5 (Iowa 2001). It is clear that both Arch and NSC knew how to exclude certain contractual claims. The fact that certain contractual claims needed to be excluded from coverage also demonstrates that contractual claims are generally covered under the policy.

There was sufficient evidence for the jury to conclude NSC failed to prove the exclusion applied to attorney fees awarded to Westlake.

### III.    NSC's post-trial motions

NSC claims the court erred in denying its post-trial motions because: (1) "the jury verdict is not supported by substantial evidence"; (2) "the jury did not deliberate before making its unsupported and inconsistent findings"; (3) "the jury's verdict is internally inconsistent"; and (4) "the district court refused to instruct the jury on two applicable exclusions."

With respect to its first contention, NSC specifically claims the jury's findings that all the property damage occurred during the policy period and that none of the policy exclusions apply to any part of the consent judgment are not supported by substantial evidence.  We have addressed these contentions in our analysis with regard to the policy coverage and for the reasons stated above, we find them to be unpersuasive.

In regard to NSC's challenge to the length of time the jury deliberated and the "rash" decision the jury reached, we also find this claim to be unpersuasive.  As the district court noted in ruling on this claim,

> Plaintiff [NSC] argues the jury's verdict should be set aside due to irregularity.  See Iowa R. Civ. P. 1.1012(2).  This is based upon the fact that the jury returned the verdict approximately one hour after deliberations began.  The court denies this request.  In addition to the reasons set forth in Westlake's resistance, the court notes that it read lengthy jury instructions and gave each juror a paper copy of instructions to read along with.  The court also explained the entire verdict form to the jury.  Counsel presented very thorough closing arguments, in which they discussed the instructions and verdict forms.  The jury listened to a three-week trial in which the evidence was presented in a [professional] fashion.  All of these factors could explain the speed with which the jury reached its verdict.  Nothing suggests irregularity in the verdict.

(Footnote omitted.)  We affirm the court's ruling.

With respect to NSC's claim that the jury's verdict is internally inconsistent, NSC contends because the jury found the exclusions for property damage during construction and alienated premises did not apply, "[t]ogether these two findings—i.e., no damage during construction and no damage after the sale— mean there was no damage at any time, an impossibility."

"A verdict is not inconsistent if it can be harmonized in a reasonable manner consistent with the jury instructions and the evidence in the case, including fair inferences drawn from the evidence." *Pavone v. Kirke*, 801 N.W.2d 477, 498 (Iowa 2011). "When deciding if a verdict is inconsistent, we liberally construe the jury's verdict to give effect to the jury's intention and harmonize the jury's answers if possible. We also must determine whether the verdicts can be reconciled in a manner reasonably consistent with the evidence and the jury instructions." *Id.* "Only where the verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside." *Hoffman v. Nat'l Med. Enters., Inc.*, 442 N.W.2d 123, 127 (Iowa 1989).

We find the jury's verdict can be harmonized in a reasonable manner consistent with the jury instructions and the evidence in the case, including fair inferences drawn from the evidence. As discussed above, substantial evidence supports the jury's finding that the alienated premises exclusion did not exclude liability after the sale, the time when the majority of property damage took place. This argument is unpersuasive.

Finally, we reject NSC's claim that "[a] new trial is required because the district court refused to instruct the jury on two applicable exclusions." We observe the parties and the court worked together to reach the forty-two jury

instructions submitted to the jury at the close of the three-week trial. Generally, a challenge to jury instructions is waived if not raised before closing arguments are made to the jury. *See* Iowa R. Civ. P. 1.924 (stating that objections to jury instructions must be made and ruled on before arguments to the jury and that "[n]o other . . . objections shall be asserted thereafter, or considered on appeal"); *Olson*, 728 N.W.2d at 848 (same).

At the jury instructions conference, following the parties' submission of proposed instructions, NSC made general objections to the instructions "inconsistent or different from the instructions [it] filed with the Court." NSC's objections were not sufficiently specific to avoid waiver of the error. *See* Iowa R. Civ. P. 1.924 (providing the objecting party must "specify [ ] the matter objected to and on what grounds"); *Olson*, 728 N.W.2d at 849 ("The objection must be sufficiently specific to alert the trial court to the basis of the complaint so that if error does exist the court may correct it before placing the case in the hands of the jury." (citations and internal quotation marks omitted)). In its ruling on NSC's post-trial motions, the district court stated:

> The court rejects NSC's arguments concerning the verdict form. Westlake's resistance accurately sets forth the manner in which the instructions were prepared in this complex case. The verdict form was crafted and agreed upon by counsel for both parties. NSC did not object to the verdict form before it was read to the jury, and waived any such objection.

We affirm the court's ruling on this issue.

## IV. *Prejudgment Interest*

On cross-appeal, Westlake contends it should be awarded additional prejudgment interest. The district court awarded prejudgment interest at 2.12%

commencing October 27, 2011, the date Westlake filed its counterclaim. According to Westlake, "Iowa law entitles Westlake to additional prejudgment interest, accruing at 5% from September 27, 2011, the date of the settlement in the Underlying Action."

"Generally, interest runs from the time money becomes due and payable and, in the case of unliquidated claims, from the date they become liquidated. Unliquidated damages normally become liquidated on the date of the judgment." *Hughes v. Burlington N. R. Co.*, 545 N.W.2d 318, 321 (Iowa 1996) (internal citations and quotation marks omitted). Here, as Westlake's damages were unliquidated at the time of the consent judgment, prejudgment interest on its counterclaim runs from the date Westlake filed its counterclaims. *See* Iowa Code § 668.13(1) (2013); *see also Baumler v. Hemesath*, 534 N.W.2d 650, __ 656 (Iowa 1995) (noting pre-judgment interest under section 535.3 runs from the filing date of the pleading which contains the claim on which a judgment was entered). Because Westlake's counterclaim against NSC was filed on October 27, 2011, Westlake is only entitled to pre-judgment interest on its counterclaim from that date.

Where there is no evidence of an agreement between the parties as to amount of prejudgment interest, we look to the applicable statutory interest provisions. *See Hughes*, 545 N.W.2d at 321. Iowa Code section 535.3(1) provides, in relevant part: "Interest shall be allowed on all money due on judgments and decrees of courts at a rate calculated according to section 668.13 . . . ." Section 668.13 provides, in relevant part:

> Interest shall be allowed on all money due on judgments and decrees on actions brought pursuant to this chapter, subject to the following:
>
> . . . .
>
> 2. If the interest rate is fixed by a contract on which the judgment or decree is rendered, the interest allowed shall be at the rate expressed in the contract, not exceeding the maximum rate permitted under section 535.2.

Iowa Code section 535.2 (1)(a) provides, in relevant part: "[T]he rate of interest shall be five cents on the hundred by the year in the following cases, unless the parties shall agree in writing for the payment of interest at a rate not exceeding the rate permitted by subsection 3: . . . Money due by express contract." *See id.* Insurance policies, such as the NSC policy at issue in this case, are a type of express contract. *See, e.g.*, *First Am. State Bank v. Cont'l Ins. Co.*, 897 F.2d 319, 328 (8th Cir. 1990) (analyzing insurance contract under Iowa law, concluding five-percent rate under section 353.2(1)(a) applied).

Accordingly, the district court erred in declining to use the default interest rate of five percent to the judgment entered here, accruing from October 27, 2011. We reverse the district court's award of prejudgment interest and remand for entry of supplemental judgment in accordance with this opinion.

## V. *Conclusion*

On NSC's appeal, we affirm the district court's interpretation of the term "occurrence" in the policy and the jury's verdict following trial. On Westlake's cross-appeal, we reverse the district court's award of prejudgment interest and remand for entry of supplemental judgment in accordance with this opinion.

Costs on appeal and cross-appeal are assessed to NSC.

**AFFIRMED ON APPEAL; REVERSED AND REMANDED ON CROSS-APPEAL.**